This case is case number 4160669, Paul v. Delatte, for the appellant, Barbara Scherer, and for the appellee, Gary Geisler. Please proceed. May it please the Court, opposing counsel, I represent the petitioner, appellant Kristen Hall. Today, I'm asking you for several things. Most importantly, I'm asking you to reverse the decision of the trial court of Judge Coryell, which changed primary custody of Dixie, the party's minor child, from her mother, my client, Kristen, to her father, Pat. I'm also asking that you reverse the provision of the parenting plan awarding Pat sole decision-making, when prior to 2016, when Judge Coryell rendered his decision, my client, Kristen, had not only made all decisions for this minor child, but had really done a good job. Everybody agreed. The judge, the GAL, both of the parties, and all the witnesses that testified on behalf of Kristen indicated that Dixie is a delightful, happy, well-adjusted child. And that's because my client had done such a good job with her, and there was no reason for a change. If you look at the ruling of Judge Coryell, it just doesn't make sense. There's no evidence to support it. This was a modification. It was a modification under the 2016 changes to the IMDMA, which had been in effect around seven to eight months at the time this case was tried. If no written order was ever filed, why is it a modification? Justice Knecht, I figured that one of you was going to ask me that right off the bat. Well, that's why we did. Right, obviously. Okay. I will tell you why it's a modification. To begin with, when the parties were in court in September of 2013, they read an agreement into the record which indicated that what was then known as custody, now what we call parenting time, was going to be with my client. That Dixie would predominantly reside with Kristen. In fact, not that it was needed when they read the agreement into the record in September of 2013, but the parties agreed on the record that Kristen, at that point in time, would be moving from the Decatur area to Edwardsville, Madison County, Illinois, which is roughly an hour and 45 minutes to two hours away from Decatur. All of this was read into the record. Additionally, and probably most importantly, although no written agreement was entered memorializing it, and I did not try this case. I am the appellate court attorney, so I don't know why that wasn't done. I do know that the parties observed what we now call the parenting time or the schedule until the summer of 16 when Judge Coryell changed it. I also know. I thought they moved back in together. I'm sorry? I thought they moved back in together. Justice, they did. For a short period of time, they did. But the agreement that they put in the record in September of 2013 was that Kristen would have the majority of parenting time, that Pat would have, I believe it was Wednesday to Sunday, that she was moving to, I cannot recall if it was Edwardsville or Glen Carbon, but a distinction without a difference. She did move back in with him for a period of time, but that agreement was read into the record. Additionally, and probably most importantly, as far as whether to determine whether or not this is a modification or an initial determination of who Dixie should live with, most importantly, a child support order was entered requiring Pat to pay child support to Kristen. We don't do child support orders unless there's an award of parenting time or custody or visitation, and that's what was done. And Pat paid that child support. There was an order, and under the Parentage Act, it indicates that absent a specific ruling saying one parent has primary custody or one parent has visitation, that a child support order with one presumes what was then known as custody or primary parenting time with the other. Pat makes a great deal of the fact that there was never a parentage order entered. Well, if there was never a parentage order entered, then I guess my question is, how could Judge Coriel even award him any sort of custody or parenting time? Another question that I have had throughout, I mean, when I began looking at this case was, how is it that Judge Coriel awarded him any sort of parenting time which would allow him to move Dixie from Madison County, Illinois, to Decatur, which with a two-hour ride, I think we can all agree it's more than 50 miles away, under the new relocation statute, which would have been in effect in the summer of 16. He never filed a petition for relocation. At that point in time, anything more than 50 miles, he would have had to have leave of court to move her. So back to your question as to why this is a modification. There was an order that was written, that was read into the record. It was not memorialized. They both had attorneys. I have no idea why somebody didn't prepare an order. But they observed that agreement for, well, until the summer, I guess it was early fall, pardon me, of 2015. Pat initially filed a petition to determine, I guess, parenting time. He filed it shortly before the changes to the IMDMA. Kristen filed a motion to dismiss indicating we're at the modification stage. And he himself filed a petition for modification, an acknowledgement by himself and counsel that at this point in time, when this case was brought up before the court again, this is a modification. It's not an initial award of parenting time. But there's a concession by your client that, by her counsel at the time, that you're right, Judge, there's never been a. . . Your Honor, and I, again, I figured that somebody would ask me about that. I don't agree with that. I think that can be interpreted two ways. They're in the middle of trial. Judge Correale gave conflicting statements throughout as to whether or not this was a modification or not. He had the pleadings before him that indicated it was a petition for modification. I think that the judge's comment was, we're looking at this as if it's an award. I mean, I don't know that there was a tacit agreement. And even if it was, even if Kristen's trial attorney made a mistake, isn't it the job of the judge to be the gatekeeper and to make sure that the proper statute is followed and that the proper standard is being applied? I mean, I guess my question is, if her attorney, her trial attorney, worst case scenario, let's say he agreed with the judge on this. And it's unclear to me from some of the judges' comments, the trial court's comments throughout this, whether or not they were viewing this as an initial determination of best interest or a modification where you have to prove, one, a substantial, by a preponderance of the evidence, a substantial change, and then you move on to whether or not those changes indicate that a change in, I'm going to call it the schedule just because it's easier to call it the schedule, is necessary to serve Dixie's best interest. I believe that Judge Corio made conflicting comments throughout. But even, let's just say, let's just say Kristen's attorney was wrong by agreeing with him. Does that mean that it's right for this judge to view this as an initial proceeding as opposed to a modification? It's clearly a modification. They've been in this pattern that they've read into the record for almost three years at the time of trial. Kristen primarily raised this trial. She made decisions for her. She was the one who stayed home with this trial when this trial was set. She was the primary caretaker of this trial. There was uncontroverted evidence. It's also notable to me that a parent, Pat, the father, who's filing a petition for modification, and part of the basis of this petition for modification is that Kristen lived two hours away. She didn't have family there. She didn't have a support system. We've got these wonderful schools in Decatur. Everything is better for her in Decatur. My family's here. My fiancé, now wife, is here. It's notable to me, and I've been doing this for 28 years, I have never, ever tried a modification, not to mention an initial custody case, with the only person I call as a witness is my own client. He has all these great support systems in Decatur. He has his fiancé there, who herself is an attorney, who was there for the whole trial, yet he doesn't call any of them as a witness. The only witnesses, and there's uncontroverted testimony, were Kristen and her family and her former worker, former co-worker, pardon me. I mean, those were the witnesses. Everybody testified that this child is doing great, that Kristen's done everything. There was nothing indicating that there was any substantial change in circumstances. The things that were somewhat cited and definitely pointed out by Pat in his brief are Kristen moved. Well, Kristen was given permission to move. She may have been living there at the time that this court entered its order, or they read the agreement to the record in September of 13 and come back for a while and moved again, but certainly we're not going to be punishing parents for availing themselves of the ability to move when a court order allows it, and I hope we're not going to set a precedent where we're punishing young parents who are early on in their career. When this case started in 13, Kristen was in school. She subsequently graduated. It's not unusual early on in a career to maybe move around a little bit for jobs. That's what she did. When she moved, she was living in St. Louis at the time of the September 13 agreement. She came back to Decatur in hopes of working things out, finished up her degree, went back to the St. Louis area for a job. There were problems with that job. The GAL and Pat tried to make it look as if she did something clandestine or unethical, and that's why she was fired, but her own co-worker testified as to what really happened. It had to do with where they got, I guess, the ping from your cell phone when you're doing a check-in. Even if she lied and was unethical at that job, there was no evidence that that had any harmful effect on Dixie, and what we need to look at is if some substantial change had some negative effect, such that Dixie's best interests are served by changing who she primarily was living with. The other change they pointed out is the fact that... What if we had a temporary custody order? We wouldn't be treating it as a modification, would we? Wouldn't we be treating it as an initial determination of permanent custody? That's a good question. You've got three good questions already. Let's go back to the beginning. The whole proceeding is initiated by your client in filing a petition saying, I want the world to know that this man is the biological father of this child. I want to come to court to have that issue determined. That issue is not in dispute. It's admitted after the petition is filed. That doesn't need to be adjudicated any further. The parties enter into an agreement which the prevailing party failed to finalize by entering an order. I'm not suggesting that she ought to be punished for that because it was bad form. I'm suggesting that it really does have an effect regarding how you look at what happened. I don't know that I necessarily agree with that. Well, I hope you don't. Thank you. You're advocating. Thank you. I am advocating for... I don't think it... Put it this way. The IMDMA is not meant to be punitive. And if this court doesn't view this as a modification, it's almost as if it's punitive to my client because there's no basis. Let's just assume it was... Let me go back to your question about the temporary order. Let's just assume this was a temporary order. And I enter temporary orders in cases all the time. Usually, I put something in there to the effect it will not prejudice either party at final hearing. But we all know as... I mean, I'm assuming all three of you at one point practiced law. I'm just presuming that. Or you've done enough up there that you understand that even though we put that in there, the reality is when you have a lag of time, and in this case, it was two years from the time of the September 13th agreement to the filing, and basically three years, give or take, a month until the decision. When you have that time lag, the reality is it doesn't change the reality of Dixie's life. Dixie has been living with Kristen that whole time. Kristen's been making the decisions. Uncontroverted testimony that Pat did very little. He did nothing about school. His only interest in her school, daycare, preschool, whatever you prefer to call it, that she was at in Edwardsville, was to come shortly before trial and posture to dig up negatives about my client, but nothing proactive on his part to be involved with this child's life. My client made all the decisions for this child. She did everything. And this child was doing great. So why are we changing this, even if it was an initial determination? But back to your question about temporary custody. Even if there was temporary, isn't there a rule in Illinois that custody determinations are to be finalized within 18 months of bringing the initial pleadings that would bring the issue to a head? So the fact that this case, even if you view what happened in September 13th as temporary, I don't know that we can say that a temporary order was in effect for that long. But to finalize it by bringing it back to court. I don't disagree with you. I mean, if it was my firm handling it, it would have been back there. We would have had an order to whoever was signing it within 30 days. But the other thing is that under the Parentage Act, the child support order obliging Pat presumes primary parenting, custody, whatever we're calling it, in Kristen. And that's just positive. I mean, there's no way to get around this. The other side cites, I can't remember, Rule 272 and some case laws on that. But it's not, it doesn't prove the point. It just, it doesn't. I mean, this was a final order. And they observed it. I guess my question is, if Pat didn't think that that was a final order, why did he, if he didn't think that Kristen had custody, why did he observe this for so long? Why did he let her move back to Edwardsville without putting up a fight and doing something to stop her then? How about the GAL I'd like to hear about? Well, let's talk about the GAL. Again, I did not try this case. I look at this again just like I look at, I mean, the lack of witnesses for Pat and the fact that his fiancee, now wife, who would have been, you know, clearly if custody was changed, parenting time was changed, this woman is going to be, you know, a parent in the household where this child lives and actually have more time with her than her own mother, my client. So let's look at the GAL report. Okay, so the GAL is supposed to be the eyes and the ears of the court. I have to tell you, I have never seen such a poor investigation. This is a case where this child had been living primarily with her mother for her entire life. At the time the GAL was investigating this, the child and her mother were living in, I can't remember if it was Maryville, Edwardsville, or Glen Carbon. These are all communities that are, I mean, it's the same area. She does nothing to even talk to the witnesses, Kristen suggests. She does nothing to look at the school or the community where Kristen lives, not even photos. I mean, I get that perhaps she didn't want to do a four-hour round trip, but money was never an issue for this GAL. In fact, her sloppiness was so evident in the fact that she even billed my client for one entry instead of $150 an hour, $1,500 an hour. So we're talking about a child's entire life, but definitely three years of time that this litigation has pended at times very quiet. And she spends 4.25 hours talking to people. Seventy percent of her time was spent talking to Pat, his fiancee, now wife, Alyssa Colley, and my client's former boyfriend, who does not sound like the most stand-up guy. Now let's look at what she says about him in his report. He's clearly angry at Kristen. He's the spurned boyfriend. This is also a guy whose judgment as far as parenting is so poor that while his wife, who he's married to, is dying, he moves Kristen and her daughter, Dixie, into his home. Yet she relies on him and his negative comments about her and what happened at her other job. So I don't think... But the trial court discounted most of that information. Well, but they... In making its decision. I mean, but they obviously counted a lot of what the GAL said. I mean... Well, my point is the trial court said that he wasn't buying that. But they heard it, and the GAL, it went into the GAL's recommendation. I guess my question is, then, why didn't the trial court send the GAL back to review her recommendation? Nothing in the GAL's recommendation talks about what's in Dixie's best interest. Both the judge and the GAL, and it seemed to somewhat be the theme of trial counsel for the father, for Pat. I mean, part of it was that my client... How can I put this lady-like while I'm standing in the appellate court? Is that she's a witch. Well, I mean, her own text message is call herself witch, starting with a B. But I'm not going to say that here. My mother would not be happy with me. I mean, that she's not easy to get along with, that she's cantankerous. You know, I would not want to have to parent a child with her, okay? Most of us would not. Okay, but nothing she did... Just because she was difficult or a jerk to Pat and said things like, you know, you need to get along with me. You need me more than I need you. I'm in control. I'm the gatekeeper. She may have done all those things, and it's not a good thing for a parent to do. It is not cooperative co-parenting. But there was no evidence that her doing that had any negative effect on Dixie. In fact, the only evidence that anything that went on between the parties or perhaps the more negative aspects of either party's personality had any negative effect on Dixie was between the two days of testimony. Testimony in this case was separated by roughly three weeks. I guess it was a night or two before the last day of testimony, and it was Dixie's birthday. In the parking lot, when Kristen and Pat were doing an exchange and Pat's then-fiancee, Alyssa, was present, I believe she was sitting in the car, Pat wanted an agreement that Dixie would be returned the next day because he'd enrolled her in school, unbeknownst to Kristen. He just assumed he was going to win. And when Kristen was saying, no, you know, she's in school here, she's starting here, he called her. He said something to the effect of great effing parenting, while Dixie was there crying. I mean, I would be more concerned about his negative behavior or the way he's treating Kristen. The other thing is things that they complain about with Kristen that the GAL and the judge take fault with. You know, she's not easy to get along with. She's hostile. She's difficult. She's a gatekeeper. She's a shrew, whatever term you prefer. All of those things, aside from the fact that there was no indication that those affected Dixie's best interest. I mean, not all parents. Wait. What about the ability to foster a relationship with the other parent? The GAL. That's very important. I agree with you. Well, first of all, there was no indication that Dixie was having any trouble in her relationship with Pat. The GAL, whose report the judge seemed to heavily rely on, indicates something to the effect of both of these parents have a great relationship with this child. There was no evidence that Dixie or Pat were suffering in their bond. And if anything, I would say that cursing at a parent in front of the child and saying something to the effect of great effing parenting is probably a lot worse than the parent texting, you know, I can be the biggest you-know-what, and you need to get along with me better than I get along with you. The remedy for that, let's just say that she was awful. I mean, first of all, let's not forget. She is sole decision-making at this point, and he had essentially abdicated whenever she invited him to take part. He abdicated. He didn't want any part of it. He made some decisions for Dixie, which in the scheme of things, my client didn't care that he enrolled her for swimming lessons. Should he have told her? Yeah, but she didn't. I mean, who cares? I mean, really, how is that going to affect a child if one parent enrolls them for swimming lessons? He did enroll the child for school and didn't tell her until they're in the parking lot, and he curses at her in front of their child. But everything that they try to make an issue about, that she's difficult to get along with, that she may have, you know, not co-parented with him. Well, first of all, she wasn't under an obligation at that point to make decisions with him. Right. But she'll have rebuttal. She will have rebuttal. Thank you. Thanks, Judge. You're welcome.  We're here to review the case as the appeal of this case. It's my position, and I believe that the record supports it, that this decision by Judge Correale was not against the manifest way to the evidence. This case was not a modification hearing. And yet, our firm did file, initially, a petition to determine parental issues, and then we followed that up after there had been a court appearance with Judge Correale, a petition then for modification. And I admit that that does create some confusion here. But what is not confusing is the position of Judge Correale throughout the entire hearing. Because other than the fact that Judge Correale, early on in the hearing, called this for hearing on the petition for He had, I think, three or four conversations where he was conversing with counsel for the plaintiff, and they were talking about the fact that this was an initial determination, and the attorney agreed. In fact, the attorney at one point objected to a question by the attorney for the defendant, and the basis of his objection was, there is no prior judgment. So it seems to me that at this point in the proceeding, what we're looking at is an initial determination, and whether that initial determination was against the manifest way to the evidence. I disagree with counsel when counsel says, well, the defendant, all they did was they called one witness. The guardian ad litem report is elevated and should be considered every bit as much as calling witnesses. The guardian ad litem is the eyes and ears of the court. The guardian ad litem has gone out and interviewed witnesses, looked at documents, reviewed evidence. Now, I don't agree that the guardian ad litem has to spend an equal amount of time with each side of the case. If that was the case, then we would say, well, there should be an equal amount of time in presenting evidence when you're in the courtroom. Well, of course, when we're in the appellate courtroom, that's true. But did the GAL talk to any of the mother's witnesses? I don't believe so. I don't believe so. I think that the guardian ad litem viewed this case much the same way that the judge viewed this case, that there was a real big problem in this was the interference with the parenting ability of the other parent, whether there was a fostering of this relationship between the child and the other parent. I'd like to go back for a moment and talk about the 2013 hearing. And even though there was no judgment in it, there was testimony in the transcript as part of the record. And at that time, in 2013, she testified that she was in the process of moving back to Decatur. In fact, she testified she had a job interview in Decatur the following day. So we had a pretty much equal parenting arrangement. She was called the custodian, the primary custodian. But it was pretty much an equal parenting type of arrangement, where he was going to have the child from Wednesday to Sunday. And if she was moving back to Decatur, they were going to be in the same community. In fact, a very short time thereafter, the two of them were living together again in Decatur. And then, that lasted for a period, I think, of four months. And at the end of that four months, she's still living in Decatur. They're still living in the same community. The grandparents on both sides were still in the community. The child had a tie to that particular community. And then, as noted by the trial court, suddenly she just up and moved away. Now, the trial court did not buy every single thing that was in the guardian ad litem report. However, there were statements made by the boyfriend, I think his name was Byron, to the effect of when she moved down there, she did not move down there because of the job. She moved down there to move in with him and, in fact, was living with him. Well, there was testimony about her having a lease, although it was not signed. The lease is one of the exhibits at trial. In Glenn Carvin, his testimony, or at least his report to the guardian ad litem, that she was actually living in Lake St. Louis with him. And then, as the trial was approaching, then she purchases a home, and she, at that point, is living in Edwardsville. But the point is that when you have one parent living in one community and another parent who's living in the other community, that situation is right for a parent to create a hostility to the other parent, an interference with the parenting skills of the other parent. And it seems to me if there's one thing that everybody agrees, all lawyers and I think all judges and all psychologists, that we all agree upon, is this, that it's terribly important for both parents to have a meaningful relationship with the child. Yes, one parent can be assigned to have parental responsibilities and to make those decisions, but it's equally important that each parent have a meaningful relationship with that child, and if you don't, that has long-range effects upon that child. They may not be evident today, they may not be evident when the child is seven or eight years old, but they manifest themselves. They become evident. In fact, our statute says one of the factors that the court should look at in determining the best interest of a child is the ability to promote and facilitate the relationship. The willingness to promote the relationship between the child and the other parent. And it seems to me that the evidence is supportive that that's exactly what Patrick would do. And the evidence is far from being supportive that that's what Kristen would do. In fact, the evidence is contrary to that. The evidence is not only did she move to a different community, but that she did not keep him in the loop of information, she did not make him aware of where his activities were, and where she was going to school, and the name of the teacher. She even admitted that she didn't tell him where she was living at down there, and gave some reason for that as she didn't think that she should. So there was a hostility there which was manifested more so on her part, and as a result of that, his relationship with the child had to be affected. Now, in an isolated world, is she a good parent or is he a good parent? I think the evidence is that they both have that ability. But were they both acting as good parents? Were they both doing everything for the benefit of the child, prioritizing the child and the child's interest? And I think the record is that's not the case. So was there evidence within the record for Judge Correale to base his decision upon? Clearly there was. Clearly there was. This is far different than the Wyckoff case. In the Wyckoff case where the court reversed the decision, in that case you had a guardian ad litem report that went the other way, you had a child that went the other way, both of them said that the child should be with the mother, and the court ruled in favor of the father, and basically it was the child would be better living in the same town where the father's at. This case is far different than that. There certainly is evidence supporting the decision by the judge in this particular case. The judge had the ability to view the witnesses and to stand in judgment of their credibility. And the judge made a number of comments during the course, particularly at the end there with regards to his thinking and reasoning, and I think it was well-founded. It was a good decision. Thank you. Thank you, Counsel. Any rebuttal? Yes, Your Honor. Okay. No surprise there. Your Honor, just because the judge viewed this as an initial determination of custody doesn't mean it's right. If that was accurate, I wouldn't be standing here in Springfield, Illinois today. Mr. Geiser takes issue with the facts that we almost want. I mean, like we're trying to get you to review this de novo, to have a new trial here. We're not doing that, but the reality is when you look at family court cases and custody decisions, the reality is they tend to be very fact-specific. So let's look at the facts here. He makes a great deal of the fact that Kristen was hostile, and then we take this jump to it's not in Dixie's best interest because she's not fostering a relationship. Yet there was not one iota of evidence that my client's perhaps nasty gram texting and that kind of behavior had any negative effect on Dixie. I mean, these people are going through a breakup. They're in the stages after a breakup. My client didn't share her address. The reason she didn't share the address is because her boyfriend Byron was harassing her. Pat knew where she was. He had her cell phone. He met with her every time. And the remedy for that is not to change primary parenting time and to move a child, what is it, 120 miles away. It's to maybe file a petition for rule of show cause or have your attorney send a letter saying we need the address. It's not this. There's no evidence anywhere that shows, first of all, that there was any substantial change. But even if you do find substantial change, there's no evidence anywhere that this was necessary to serve Dixie's best interest. Nobody looked at what they were uprooting this child from, her home, her school, her friends in the community. None of that was looked at. I'm also concerned that while Kristen is being portrayed as difficult and a shrew, neither the judge nor the GAL took issue with the fact that a witness testified that Pat's fiancee during the summer of 15, and this is the woman who's going to be living in the house with this child, gets into a bar fight of such an extreme extent that she threatens the bartender with, I'm an attorney, which she was not at the time. She had just graduated law school, so she wasn't even an attorney. And if she was, I'm sorry, if you're drinking too much in a bar, do you throw out there, well, I'm a justice, you can't do this to me? No. And I don't throw out, I'm an attorney, you can't do this. But what kind of example does that set? I mean, is there any concern that this woman, Allie, is going to be the female parent in this house, one of two parents if we change custody, and this is how she's behaving in public? That's kind of aggressive behavior. Nobody took issue with that, but the fact that Kristen had some nasty gram texting was not a problem. Also, quickly, the parenting plan, I have trouble believing anybody can think that's in Dixie's best interest. Even if you were to change primary parenting to Pat, suddenly the woman, the parent, that this child has predominantly lived with is now getting 56 days a year. The parenting plan says that, although the parenting plan is skewed. It actually indicates Kristen has 309 days and Pat has 56. But when parents live this far away, usually the parent who lives far away gets, you know, a significant time around the holidays. None of that. The way the holidays work, the parent gets the child who hasn't the night before. Otherwise, you get the child from like 1 to 7 p.m. when they're living two hours apart and no time during the summer. It just doesn't make sense. This whole opinion, the whole decision, and the adoption of the parenting plan, it's almost as if the judge couldn't have read it because there's no way that parenting plan can be in Dixie's best interest. Thank you. Did she present a parenting plan? She did not, and I don't know why. She had the majority of parenting time, but even if she didn't, the IMDMA is not meant to be punitive. Issue an order requiring her attorney to submit a parenting plan. But even if she didn't, you don't adopt a parenting plan that's contrary to this child's best interest. Even if primary time was given to Pat, Kristen had made all the decisions for this child. Nobody pointed out one problem this child had or anything that was an indication that this child's best interest would not continue to be served maintaining the status quo. Yes, suddenly Pat, who didn't even want a copy of this child's insurance card, is making medical decisions. The guy who came to Edwardsville to meet at the YMCA, Kristen set up an afternoon of him meeting with the child's daycare preschool provider, the director of the school, all that. All he did was spend 20 minutes there mainly trying to garner information about Kristen not sending the child on certain days. I mean, who cares? She's in preschool. Kristen would sometimes take a day off of work, and instead of sending her to preschool, would take her to the magic house for the day or the museum or the science center. I mean, this isn't bad for a kid. It's not like she's taking her out of high school to take her skiing. I mean, she was doing educational activities. I mean, she had the latitude to do that. So I would ask that you reverse and remand for specific findings of a substantial change in best interest. Thank you, Your Honor. Thank you. Thanks to both of you. Please submit. Court is in recess.